**Duncan STUART, Plaintiff,**

v.

**BEECH AIRCRAFT CORPORATION and Raytheon Corporation, Defendants.**

**Civ. A. No. 88–1388–T.**

United States District Court, D. Kansas.

Oct. 30, 1990.

Richard J. Peckham, Andover, Kan., for plaintiff.

Duncan Stuart, pro se.

Terry J. Torline, William Robert Martin, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, Kan., for defendant Beech Aircraft Corp.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on defendants' motion for summary judgment (Doc. 28). Since the court does not believe oral argument would materially assist in the decision of this matter, defendants' request for oral argument (Doc. 37) is denied.

Plaintiff, a former senior staff engineer with defendant Beech Aircraft Corporation, contends that Beech and its parent company Raytheon Corporation, discharged him in retaliation for certain complaints he made regarding Beech's Starship aircraft. Plaintiff alleges he was retaliated against for his activities in discussing allegedly defective or unsafe designs with other Beech employees during his period of employment with Beech. Plaintiff also contends that Raytheon participated and acquiesced in his layoff by creating improper scheduling deadlines and by ratifying his dismissal by Beech. Pretrial Order, Doc. 41.

The court is familiar with the standards governing the consideration of a motion for summary judgment. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The burden at the summary judgment stage is similar to the burden of proof at trial. The court must enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails

to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim(s). Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. at 2553 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed.R.Civ.P. 56(e). Each party must demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on the particular claim. *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513.

The plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment, even when the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery. *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514. Any problem with a premature motion for summary judgment may be resolved under Fed.R.Civ.P. 56(f), which allows a summary judgment motion to be denied if the nonmoving party has not had an opportunity to make full discovery. *Celotex,* 477 U.S. at 326, 106 S.Ct. at 2554. The nonmoving party need not produce evidence in a form that would be admissible at trial to avoid summary judgment. *Id.* at 324, 106 S.Ct. at 2553. "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, ..." *Id.*

Plaintiff's complaint that certain facts are within the possession of the defendant is insufficient to controvert those facts. Plaintiff did not take advantage of Rule 56(f) and it appears that plaintiff has had a full opportunity to conduct discovery. For the purpose of the motion for summary judgment, the following facts are uncontroverted:

1. Plaintiff, Duncan Stuart, is a citizen of the United Kingdom who presently resides in the City of Wichita, Kansas.

2. Defendant Beech Aircraft Corporation (Beech) is a Delaware corporation with its principal place of business in Wichita, Kansas.

3. Defendant Raytheon Corporation (Raytheon) is a Massachusetts corporation having its principal place of business in Lexington, Massachusetts.

4. Plaintiff was hired by Beech as a senior staff engineer effective December 6, 1982. Plaintiff was hired to work in Beech's Engineering Division (Department 90) on Beech's Model 2000 Starship project, which involved the development and design of Beech's new all-composite aircraft. No written contract of employment was executed between plaintiff and Beech. Plaintiff never entered into a contract covering the duration of his employment with Beech. The parties have stipulated that plaintiff was an employee at will. *See* Pretrial Order, Doc. 41.

5. Plaintiff does not have a degree in mechanical engineering or aeronautical engineering and he is not a licensed professional engineer.

6. In 1983, plaintiff was assigned to the Starship control surfaces design group as the group leader. The control surfaces group was to design the rudders, elevon, flaps, and elevator for the forward wing of the Starship. Plaintiff's assignment in the control surfaces area lasted from 1983 until he left Beech on October 2, 1987, at which time all of the control surface designs were substantially complete.

7. The design duties of plaintiff and the control surfaces group were not directly related with any of the following: the de-

sign of the H-joint, the design for the method of attaching the pressure bulkhead to the fuselage, the design for the cabin door, the testing or analysis of the benefits of disadvantages in the use of scrim cloth, the solving of stall characteristics associated with the Starship aircraft, the testing or analysis of the proper paste adhesives to be used in the Starship, the supervision of the activity in the tooling or production departments at Beech, the designing of tooling for the Starship, or the selection of the elevator de-icing system to be incorporated into the Starship. The court notes that plaintiff attempted to controvert this statement of fact. However, the portion of the record plaintiff relied upon does not controvert defendants' statement of fact.

8. Plaintiff openly voiced his opinion to the Beech Engineering Department on numerous occasions concerning the purported disadvantages, flaws, or problems with the designs and activities described in paragraph 7. Additionally, he openly presented to the Beech Engineering Department his alternatives to solving these alleged Starship design problems on numerous occasions from 1983 until he left Beech on October 2, 1987.

9. During the development phase of the Starship project, the Beech Engineering Department investigated, assessed, analyzed, and tested all of the concerns raised in plaintiff's August 27, 1987 report, as well as others, before determining which designs Beech intended to incorporate into the Starship.

10. Beginning in 1982 and continuing into 1988, Beech experienced a significant decline in the sales of its aircraft. Beech attributed the decline in its sales to the overall economic conditions and the general decline in the aviation industry.

11. In 1986, based on the amount of engineering work required to complete the Starship project, Beech determined that the design and development phase of the Starship project should be substantially completed by December 1987. Beech was aware that its tight budget would result in few new development programs taking place within Beech in 1987.

12. Based on the decline in the general aviation industry, the lack of funds for new development programs, and the anticipated 1987 completion date of the development phase of the Starship project, Beech management determined that Beech would be required to significantly reduce the number of personnel employed in the Starship Engineering Department in 1987.

13. To accurately predict the number of employees necessary to efficiently and economically complete the various engineering and design efforts ongoing at Beech in 1987, Beech developed an Engineering Manpower Reduction Plan. This internal plan was formulated in conjunction with recommendations made by an independent consulting firm hired by Beech to assess Beech's operations for the purpose of increasing the economic efficiency of the company and reducing overhead. This independent consulting firm was called the MAC Group.

14. The Engineering Manpower Reduction Plan forecasted, on a monthly basis, the number of engineers required to complete the various design tasks still remaining on the outstanding projects ongoing at Beech in 1987. The plan also forecasted the number of engineers who would be considered surplus to the Starship program, as well as other programs within Beech, at year-end 1987.

15. Beech management decided that engineers who were considered surplus would be "off-loaded" from the project where they had been assigned. "Off-loading" is a term used at Beech to describe when an employee is relieved of his responsibility on a certain project and is either transferred to another project or given the opportunity to find other work within Beech. It is generally only after a person is off-loaded and cannot find other work on other projects within Beech that the employee is subject to layoff.

16. In June 1987, Beech became aware that the McDonnell–Douglas Company in California was seeking additional engineering personnel to complete certain projects which were behind schedule. Recognizing that the Beech Engineering Department

would be facing significant cutbacks in 1987 and that Beech could retain excess personnel by loaning them to McDonnell–Douglas, Beech management contacted McDonnell–Douglas and informed them that Beech was willing to "loan" its surplus engineers to McDonnell–Douglas.

17. The McDonnell–Douglas project provided Beech with an opportunity to temporarily off-load excess personnel while retaining them on the Beech payroll for assignment to future programs at Beech as the budget became available. The terms of the temporary contract assignment included: (1) the employee remained a Beech employee at the same grade and same salary; (2) the duration of the assignment would be a minimum of six months; (3) the employee would be given a sufficient per diem to cover temporary living expenses; (4) the employee would be provided with paid monthly trips to Wichita; and (5) the employee would be eligible for a completion bonus at the end of the six month loaning period.

18. To be sure the Starship Engineering Department remained on budget pursuant to the 1987 Engineering Manpower Reduction Plan, Starship program manager Joe Furnish directed his engineering administrator Jack Shoup to prepare and distribute individual manpower reduction forecasts to each manager in the Starship program. The individual Starship managers included Jack Shoup, Ed Hooper, Gary Barr, Randy Robinson, and Bob Simmons. The individual manpower reduction forecasts were completed and distributed by Jack Shoup on or about July 16, 1987.

19. On July 31, 1987, and at the direction of Joe Furnish, Jack Shoup prepared an overall Starship project manpower reduction forecast which evidenced the number of engineers required to be off-loaded from each Starship manager's group during each month from August to December 1987. These monthly forecasts purposely coincided with the 1987 Engineering Manpower Reduction Plan figures.

20. To comply with the monthly personnel reduction forecast, Joe Furnish and Bill Brown met with the Starship engineering administrator, Jack Shoup and each group manager whose group was affected by the manpower reduction. These meetings were conducted to select employees from the manager's group to be off-loaded from the project. These meetings were commonly called MAC Attack or MAC Group meetings because of their connection with the independent MAC Group consulting firm.

21. During the MAC Group meetings, Joe Furnish, Jack Shoup, Bill Brown, and the group manager discussed various factors in selecting individuals for off-loading. Included in the factors considered were the tasks left to be completed on the Starship, the various employee's talents, qualifications, salary, and duties, and the specific engineering requirements necessary to complete the outstanding tasks on the Starship.

22. On August 12, 1987, a MAC Group meeting was held in Joe Furnish's office located in Building 31. Joe Furnish, Jack Shoup, Bill Brown, and Ed Hooper were in attendance. During this meeting, plaintiff and several other Starship engineering employees were selected for off-loading.

23. It was also determined at this August 12, 1987 meeting that because of plaintiff's position as control surfaces group leader, he would be informed of his upcoming off-loading by Bill Brown.

24. Joe Furnish directed Bill Brown to inform plaintiff of his scheduled off-loading as soon as possible after the August 12, 1987 meeting so that plaintiff would have an opportunity to find other work within Beech or to seek new employment outside of Beech.

25. On or before August 21, 1987, Ed Hooper prepared a list of individuals from his group whom he planned on retaining on the Starship project over the upcoming months of 1987. This list was broken down by month and shows plaintiff's name missing from the November list. This list evidences the earlier decision made by Joe Furnish, Bill Brown, Jack Shoup, and Ed Hooper to off-load plaintiff from the Starship program. The court notes that plaintiff attempted to controvert this factual statement by relying on his affidavit, which

merely states his conclusion that he was retaliated against for raising alleged safety problems with the Starship. Plaintiff's affidavit is not made on personal knowledge and is insufficient to controvert the defendant's statement of fact regarding when the off-loading decision occurred.

26. On August 27, 1987, plaintiff submitted a document entitled "Confidential Report—Starship Program" (the "Stuart report") to Beech President Max Bleck. The report describes plaintiff's criticisms of Beech's decision to use certain designs in the Starship aircraft. Plaintiff had openly voiced these criticisms to the Beech Engineering Department throughout the years since 1983. The Stuart report also charges plaintiff's supervisor, Ed Hooper, with being directly responsible for the alleged problems associated with the Starship program.

27. Upon receiving the Stuart report, Max Bleck contacted Joe Furnish, the program manager of the Starship project and ordered Furnish to "look into this."

28. After reviewing the report, Joe Furnish contacted Bill Brown and they both began checking into the allegations and criticisms contained in the Stuart report. Joe Furnish did not contact Ed Hooper about the report. When Hooper actually became aware of the Stuart report may be controverted; however, plaintiff does not even allege that Hooper had actual knowledge of the written report before selecting plaintiff for off-loading.

29. After investigating the allegations of the Stuart report, Furnish determined that plaintiff's concerns were unfounded. Furnish reported these findings to Max Bleck.

30. In early September 1987, in order to recruit engineers to loan to McDonnell–Douglas, Ed Hooper circulated a handwritten memo to all engineers in his group. The memo explained that McDonnell–Douglas wanted to borrow even more Beech engineers and Ed Hooper was soliciting the names of interested people. Plaintiff did not submit his name for consideration by McDonnell–Douglas.

31. Within the first two weeks of September, Ed Hooper approached plaintiff, stated that he (Hooper) understood that plaintiff was scheduled for off-loading in the coming month, and suggested that plaintiff rethink his decision to not apply for the contract labor job with McDonnell–Douglas. Plaintiff again declined to submit his name and resume for consideration by McDonnell–Douglas.

32. On September 24, 1987, Starship Engineering Administrator Jack Shoup directed a memo to Carl Mitchael, the Manager of Engineering Administration, notifying Mitchael that plaintiff, Darrel Haun, and Joyce Mayfield were available for reassignment or layoff effective October 2, 1987.

33. Carl Mitchael received the memo in the regular course of business and notified department managers within Beech who had openings for personnel and who would have been interested in offering one of these individuals a position based on the type of work they were capable and qualified in performing.

34. Two of the individuals who were notified of the plaintiff's availability were M.R. "Tex" Donaldson and Gary Bickel. Donaldson was the manager of Reliability, Maintainability, Engineering Quality and Liaison and the direct supervisor of Gary Bickel. Bickel was the group leader of the liaison group. Both Donaldson and Bickel contacted Jack Shoup to express their interest in obtaining more information on plaintiff and Darrel Haun so that an offer could possibly be extended to one of them for an opening in the liaison group.

35. Jack Shoup discussed Darrel Haun's and plaintiff's grade levels, salaries, and work experience with Donaldson and Bickel. Based on plaintiff's high salary, the fact that he would have to take a significant pay cut if offered the position, the fact that he would be relegated to a position amounting to a significant demotion if offered the position, and the fact that the available position was better suited for the lesser-paid Darrel Haun, Donaldson and Bickel decided to hire Haun. The court notes that plaintiff's response, "If we are

to believe that Stuart was discharged because his [sic] 'HIGH SALARY AND GRADE LEVEL', when even his subordinates were retained, then surely there is a tooth fairy!" is plainly insufficient to controvert defendants' statement of fact. Plaintiff's further response that the motive for plaintiff's discharge "could only have been retaliation" is mere allegation. Additionally, plaintiff's affidavit does not reflect how plaintiff would have the personal knowledge of defendants' motives necessary for a summary judgment affidavit.

36. On October 2, 1987, plaintiff was laid off from his employment with Beech. Plaintiff's layoff was reviewed and approved by Jerome Williams, the Supervisor of Personnel at Beech.

37. On October 21, 1987, plaintiff prepared a letter addressed to Max Bleck. Plaintiff indicated that he believed his August 27, 1987 report he had submitted to Bleck was somehow involved in his layoff. Plaintiff alleges that his supervisor, Ed Hooper, was responsible for plaintiff's layoff. Plaintiff contends that because he submitted the Stuart report, it caused Ed Hooper embarrassment, which made Hooper arrange to have plaintiff terminated.

38. On or about November 6, 1987, Max Bleck addressed a response letter to plaintiff which indicated that he had looked into the circumstances surrounding plaintiff's layoff from Beech and found that company policy with respect to work force reduction had been followed. The letter suggested that plaintiff reconsider his decision not to continue his Beech employment by applying for the McDonnell–Douglas project. In the letter, Bleck offered to have someone contact plaintiff and submit his resume to McDonnell–Douglas.

39. Plaintiff did not have his name and resume submitted to McDonnell–Douglas for consideration.

40. On or about December 9, 1987, the Beech Engineering Department prepared a departmental-wide summary of layoffs, transfers, and reductions which had occurred within the Engineering Department between June 24, 1987 and December 9, 1987. The summary reveals that a total of 80 Beech employees were either terminated or laid off during this six-month period.

41. As of January 6, 1988, 36 Beech engineers were selected by McDonnell–Douglas to participate in the McDonnell–Douglas project.

42. The Federal Aviation Administration (FAA) issued Type Certificate No. A38CE on the Model 2000 aircraft (Starship) on June 14, 1988. This certification considered and approved all designs incorporated into the Model 2000 (Starship), including those mentioned in the Stuart report.

43. Plaintiff filed this tort action against Beech and Raytheon on July 23, 1988 alleging that he was wrongfully discharged from his employment with Beech because he submitted the Stuart report. From the Pretrial Order, it appears that plaintiff is also alleging retaliation because he had raised the same complaints on prior occasions.

44. Plaintiff does not contend that any officer, director, or employee of Raytheon gave a direct instruction to any officer, director, or employee of Beech to discharge plaintiff. Plaintiff alleges that Raytheon offered bonuses to Beech management to have the Starship certified on schedule, which generated safety problems, which resulted in plaintiff submitting his Stuart report, which in turn resulted in plaintiff's layoff.

45. Neither Max Bleck (President of Beech) nor Bob Dickerson (Vice President of Engineering) have ever been offered salary bonuses by Raytheon to assure FAA certification of the Starship aircraft on schedule. Plaintiff's affidavit, which contains his "belief" that such a financial incentive was offered, is not based on personal knowledge and is insufficient to controvert this statement of fact.

46. No officer, director, or employee of Raytheon has ever made any decision or given any instruction to Beech to off-load or lay off the plaintiff.

■ The parties are in agreement that, under Kansas law, plaintiff was an employ-

ee at will during his employment with Beech. The Kansas courts have recognized a cause of action for retaliatory discharge of an at-will employee. *See Murphy v. City of Topeka,* 6 Kan.App.2d 488, 630 P.2d 186 (1981) (recognizing a cause of action for the discharge of an employee in retaliation for filing a worker's compensation claim). The tort of retaliatory discharge is an exception to the principle that an at-will employee may be terminated at any time, with or without cause. This exception usually arises when the discharge from employment seriously contravenes a very clear public policy. *Cain v. Kansas Corporation Commission,* 9 Kan.App.2d 100, 103–04, 673 P.2d 451 (1983) (holding that plaintiff's personal opinion on how the Kansas Corporation Commission should carry out the statutory purposes of the Kansas Securities Act is not public policy), *review denied,* 235 Kan. 1041 (1984).

■ The Kansas Supreme Court has recently extended the tort of retaliatory discharge to cases of "whistle-blowing:"

Public policy requires that citizens in a democracy be protected from reprisals for performing their civil duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare. Thus, we have no hesitation in holding termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing) is an actionable tort. To maintain such action, an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report. However, the

whistle-blowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain.

*Palmer v. Brown,* 242 Kan. 893, 900, 752 P.2d 685 (1988).

Under Kansas law,

Clear and convincing evidence is not a quantum of proof, but rather a quality of proof; thus, the plaintiff establishes [retaliatory discharge] by a preponderance of the evidence, but this evidence must be clear and convincing in nature.

*Newell v. Krause,* 239 Kan. 550, 557, 722 P.2d 530 (1986). For evidence to be clear and convincing,

the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.

*Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 78, 596 P.2d 816 (1979). With these standards in mind, the court turns to the present controversy.

Plaintiff's claim of retaliatory discharge requires proof by clear and convincing evidence of the following elements: (1) that a reasonably prudent person would have concluded that Beech was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, or the general welfare; (2) that Beech had knowledge of plaintiff's reporting of such violation prior to discharge of the plaintiff; (3) that plaintiff was discharged in retaliation for making the report; and (4) that plaintiff made his report out of a good faith concern over the wrongful activity rather than from a corrupt motive such as malice, spite, jealousy, or personal gain. *Palmer v. Brown,* 242 Kan. 893, 900, 752 P.2d 685 (1988).

■ Plaintiff has failed to come forward with evidentiary material sufficient to create a factual dispute on the issue of Beech's motive in laying off plaintiff, i.e.,

whether plaintiff was chosen for off-loading or laid off in retaliation for voicing his safety concerns. Plaintiff's allegations in his affidavit are insufficient to create a factual issue on the motive of Beech's officers and employees in plaintiff's layoff. The decision to off-load the plaintiff was made some fifteen days before plaintiff submitted his written report to Beech President Max Bleck. It is undisputed that during the relevant time period, Beech had suffered a decline in the sales of its aircraft. Conditions in the aviation industry in general were bad. Plaintiff was not singled out for unfavorable treatment, nor was he the only engineer off-loaded or laid off. Eighty engineers were laid off or terminated in the last six months of 1987. Plaintiff was considered for another position at Beech. Plaintiff was informed of the opportunity to go to McDonnell–Douglas at least twice. Plaintiff chose not to be considered for the contract labor job at McDonnell–Douglas. Thirty-six other Beech engineers went to work for McDonnell–Douglas to avoid layoff.

As for plaintiff's complaints of alleged safety problems with the Starship, there has been no evidence presented from which a reasonably prudent person could have concluded that Beech was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, or the general welfare. The undisputed facts indicate that Beech considered and rejected plaintiff's safety concerns and suggestions. FAA type certification signifies that the Secretary of Transportation found the Starship to be of proper design, material, specification, construction, and performance for safe operation, and complied with minimum standards, rules, and regulations. 49 U.S.C.S. App. § 1423(a)(2). Plaintiff has not identified a particular statute, rule, or regulation pertaining to the public health, safety, or welfare which Beech allegedly violated.

Beech knew of plaintiff's prior safety complaints and investigated them. On the issue of Beech's knowledge of the Stuart report, plaintiff has not alleged that any Beech officer or employee had actual knowledge of the written report before selecting plaintiff for off-loading.

On the issue of plaintiff's state of mind, it is apparently controverted whether plaintiff knew of the off-load decision before he submitted his report. This fact could be material to plaintiff's state of mind in submitting the report. Plaintiff's prior knowledge of the off-loading decision could support an inference of improper motive or malice in submitting the report. Plaintiff's lack of knowledge of the off-loading decision could support an inference of good faith in submitting the report. This potential fact dispute does not preclude summary judgment, however, since plaintiff has failed to show a genuine issue of material fact on at least one of the other essential elements to his claim.

Plaintiff has failed to make a showing sufficient to establish the existence of at least one element essential to his case and upon which he would bear the burden of proof at trial. Reviewing the evidence under the substantive law and based on the clear and convincing evidentiary burden plaintiff would face at trial, summary judgment is appropriate. Given this resolution, the court does not address defendant Raytheon's argument that it is not liable for the acts of its subsidiary corporation since there are no circumstances justifying disregarding the corporate entity.

IT IS BY THE COURT THEREFORE ORDERED that defendants' motion for summary judgment (Doc. 28) is hereby granted. The clerk shall enter judgment in favor of the defendants and against plaintiff.