Thomas E. MALEK, Plaintiff,

v.

MARTIN MARIETTA CORP.,
a Maryland Corporation,
Defendant.

No. 93–4018–SAC.

United States District Court,
D. Kansas.

June 24, 1994.

---

Dan E. Turner, Turner Law Office, Topeka, KS, for plaintiff.

Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, KS, for defendant.

### MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant's motion for summary judgment. (Dk. 110). This is an action for retaliatory discharge for pursuing workers' compensation benefits and for discriminatory discharge and failure to rehire because of a physical handicap. The defendant seeks summary judgment on all claims.

A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas*

*v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell,* 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991). When the nonmoving party will have the burden of proof at trial, " 'Rule 56(e) . . . [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992) (citations omitted). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.,* 849 F.2d at 1273.

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

■ Before going to the facts, the court must take up one procedural issue. The defendant objects to the plaintiff's affidavit as failing Rule 56(e) standards. The plain-tiff's affidavit consists of these three statements:

I have read the Plaintiff's responses to the Defendant's Statement of Uncontroverted Facts with respect to their Motion for Summary Judgment; and

I have read the Plaintiff's Statement of Additional Uncontroverted Facts attached to the Response to the Defendant's Motion for Summary Judgment;

The statements contained therein are true and correct to the best of my knowledge and belief.

(Dk. 123). Rule 56(e) sets forth that the "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Similarly, D.Kan Rule 206(c) requires the affidavits to be "made on personal knowledge and by a person competent to testify to the facts stated which shall be admissible in evidence." The plaintiff's attempt at sweepingly adopting all facts found in his brief contradicts the plain requirements of Rule 56(e) and D. Kan.Rule 206(c). First, the affidavit does not show the plaintiff to be competent to testify to many of the matters found in his memorandum. Second, the plaintiff avers that the statement of facts "are true and correct to the best of my knowledge and **belief.**" It is the plaintiff's personal knowledge, and not his beliefs, opinions, rumors or speculation, that are admissible at trial and the proper subject of any affidavit. *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989) ("A party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture."); *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1367 (8th Cir.1983) ("Under Rule 56(e), an affidavit filed in support of or opposition to a summary judgment motion must be based upon the personal knowledge of the affiant; information and belief is insufficient." (citations omitted)). Third, because of these deficiencies in the affidavit, the court cannot determine which facts it can accept as based on personal knowledge and which must be rejected as being conjecture or belief. For all of these

reasons, the court is compelled to enforce Rule 56(e) and disregard the plaintiff's affidavit. *See Adair v. Beech Aircraft Corp.,* No. 90–1003–K, 1991 WL 97610 at *7–9, 1991 U.S.Dist. LEXIS 7442, at *18–*22 (D.Kan. May 21, 1991).

For purposes of the summary judgment motion, the court accepts the following facts as unconverted:

1. From 1985 to 1988, the plaintiff, Thomas Malek (Malek), was an equipment operator for Weaver Construction. After the defendant, Martin Marietta Corporation (Martin Marietta), purchased Weaver Construction, Malek continued as equipment operator until his promotion to plant manager at Weeping Water Quarry in May of 1988. With his promotion, the plaintiff became a member of management and was paid a salary instead of an hourly wage.

2. Martin Marietta is self-insured on worker's compensation claims with CIGNA in charge of administering the claims to conclusion. Martin Marietta fully funds a salary continuation plan that benefits the injured employee for six months.

3. In early February of 1989, the plaintiff reported an accident on the job and injury to his back. The employer paid the plaintiff's medical bills, but the plaintiff was not off work for this injury. The record on this injury includes a first treatment medical report prepared for the Nebraska Workmen's Compensation Court and the employer. The plaintiff testified that the signature, dated February 22, 1989, on the report appears to be his but that he does not remember signing it. In the late fall of 1989, the plaintiff's orthopedic surgeon set a twenty-five pound weight restriction that was never removed. The plaintiff's treatment for his back injury continued until January of 1990. The plaintiff testified that his supervisor ordered him to stop the physical therapy treatment because it interfered with his ability to work late and because it was not helping him.

4. Bill Gahan served as the defendant's Nebraska Area Manager from April 1987 through July 1990. Weeping Water was one of the quarries managed by Gahan during this time. In 1990, he was transferred to Kansas and assigned a new area covering all of Kansas and part of Missouri.

5. Area managers in consultation with the vice president or general manager decide staffing questions, the hiring and transferring of salaried and hourly personnel, and the moving or closing of a plant.

6. The defendant's relevant business is structured around plants. A plant is the equipment and the crew assigned to operate it. There are two kinds of plants. A stationary plant is attached to cement footings, is generally associated with a particular location, and, because it is typically a more complex operation, may have more than one salaried supervisor, a manager and a foreman, and more employees. A portable plant is on wheels, generally has either, but not both, a plant manager or a foreman, has a smaller crew, and is typically not associated with a particular location.

7. In March of 1990, Malek was promoted to plant manager at Woodbine, Kansas. He oversaw the limestone crushing operation at that site. He was the assigned plant manager of Woodbine Permanent Plant 383 but also supervised the nearby Woodbine Portable Plant 871 during the times that it was without a foreman or manager. Malek maintained his home in Papillion, Nebraska and rented a place in Abilene, Kansas.

8. Having lost substantial money in the Central Kansas or Marion area, including over one million dollars at Woodbine, the defendant decided to downsize its operations. In September of 1990, Gahan shut down permanently the Woodbine Permanent Plant 383. The employees at Plant 383 were laid off for the winter season, and Gahan reserved his decision on permanent staffing at this location. Based on business reports, Gahan observed that Plant 383 was very inefficient.

9. In late November or early December of 1990, Gahan also decided to shut down temporarily Woodbine Portable Plant 871 pending an evaluation whether to reopen it in 1991. After seasonal layoffs, a skeleton crew remained at the Woodbine area to handle customers.

10. About this same time, Gahan observed that the price received in 1990 for the product at Little River was higher than Woodbine.[1] Gahan believed there was a better chance of succeeding at Little River because of available prices, level of competition, and the customer base. Consequently, in late November or early December of 1990, Gahan decided to continue operations at Little River Portable Plant 873, and, needing a permanent manager at 873, he transferred Malek there.[2]

11. On or about January 24, 1991, Malek, injured his back while supervising employees at Portable Plant 873 in Little River. From January 28, 1991, to February 15, 1991, the plaintiff limited his activities to supervisory work of Plant 873's operations.

12. On February 15, 1991, Gahan telephoned Malek. Gahan told Malek about the defendant's salary continuance program and recommended that Malek go home for a couple of weeks, rest, and undergo physical therapy or whatever treatment was necessary for his back. Malek took Gahan's advice and went home receiving the benefit of the salary continuance program. Malek tried physical therapy for two weeks and received no relief. In later April or early May, the plaintiff

underwent a hemilaminotomy. During this period, Malek received no workers' compensation benefits other than having his medical expenses paid.

13. When Malek took salary continuance leave, Gahan replaced Malek's position with a temporary promotion of an hourly employee. This promotion was temporary in anticipation that Malek would return as plant manager for Plant 873.

14. From February through August of 1991, the economic picture regarding the defendant's different plants in Kansas changed. In February of 1991, based on economic projections and recent contracts, it appeared to Gahan that Woodbine Portable Plant 871 could make enough money to justify its operation. Gahan brought in Keith Anderson as the foreman for Plant 871 and staffed it with hourly employees who lived relatively close to Plant 871.

15. Based upon market forces, in particular the better prices available at Plant 871 and the lack of work at Plant 873, Gahan decided in late Spring of 1991 to shut down Plant 873 and continue operations at Plant 871. With the closing of Plant 873,[3] six

1. The Little River quarry and the Woodbine quarry are approximately one hundred miles apart.

2. The plaintiff makes an unsuccessful attempt at controverting the fact of his transfer. It should be noted that the plaintiff does not controvert Gahan's assessment of the economic conditions or his need for a permanent manager at Plant 873. The relevant corporate records amply demonstrate his transfer. First, Gahan completed an Employee Change Notice showing Malek's transfer to Plant 873. Second, the defendant's payroll control sheet reflects that the plaintiff was assigned to Plant 873 for the pay period ending February 24, 1991, through the pay period ending July 28, 1991. Third, the payroll stubs given to the plaintiff, beginning with the pay period ending February 28, 1991, show the plaintiff's location at 873. Finally, the plaintiff, in his statement of fact at paragraph twenty-two, admits he was reassigned to Plant 873 in February of 1991.

Although not designated as an alternative argument, the plaintiff also seems to contend that if there was a transfer then it did not occur until after he was placed on medical leave. Gahan prepared the Employee Change Notice showing Malek's transfer to Plant 873 on February 15, 1991. Gahan testified that because Malek's

transfer did not involve a promotion or salary change he simply overlooked preparing the Employee Change Notice until February. There is nothing to controvert Gahan's explanation of this delay between actual and reported transfer. Nor is there any evidence that under the defendant's policy an area manager's transfer of salaried staff is not effective until the Change Notice is completed. Moreover, the facts support Malek's transfer to Plant 873 in January of 1991. Malek was working and supervising employees at Plant 873 at the time of his injury. Malek signed the time cards for those hourly employees assigned to Plant 873 for the week ending January 27, 1991. The plaintiff points to nothing in the record showing that prior to January of 1991 he had signed the time cards for employees at Plant 873. The court rejects the plaintiff's statement, as unsupported by a proper affidavit, that after his transfer he continued to sign the time cards for employees assigned to Plants 383 and 871.

3. The plaintiff says that the closing of Plant 873 is controverted by a report by Gahan that shows production from Plant 873 in 1992 and 1993. The plaintiff, however, ignores entirely Gahan's explanation for those production figures. The production in 1992 was actually 1991 production not accounted for until 1992. The production in

hourly employees were laid off and the other hourly employees were transferred to other plants. Malek was the only salaried staff assigned to Plant 873, and his position was eliminated with the plant's closing. Equipment remains assigned to Plant 873, but the equipment is idle for the most part.[4] Plant 873 does not have a crew assigned to it.

16. None of the hourly workers assigned to Plant 873 in May of 1991 and laid off with the closing of Plant 873 had filed a workers' compensation claim or had any pending claim from 1988 through April of 1991.

17. Malek's physician in a letter dated August 1, 1991, released him for work with restrictions of maximum lifting of twenty-five pounds, sitting no more than one hour periods, or bending frequently. The physician recommended that Malek be allowed time for stretching exercises during the work day. The physician concluded his letter with "[t]hese restrictions should apply for at least two months."

18. Malek informed Gahan of the physician's release and his readiness for a job. Gahan told Malek that he would check into available jobs and call him back in two weeks. Gahan evaluated his Kansas area and found no available plant manager positions. In the middle of August, Gahan told Malek that there were no positions for him and that he was being placed on permanent lay-off.

19. Malek received his salary continuance for six months or until August 18, 1991. Thereafter, Malek received long-term disability for two years amounting to sixty per cent of his weekly wage.

20. Malek wrote Charles Stewart, the Human Resources Director for defendant, a letter dated August 27, 1991, in which he said that he could no longer physically perform the job of plant manager.[5] Stewart replied with a letter dated September 12, 1991, explaining that a downturn in business caused the defendant to reduce its work force by twenty-five percent in the Marion area and by twenty percent overall in Kansas. Stewart observed that there was no supervisory position available because of the reduction of force and that Malek's physical limitations prevented the defendant from offering him a different position. Both Stewart and Gahan searched unsuccessfully for a management position for Malek.[6] Both Stewart and Gahan believed Malek's physical condition did not prevent him from doing the work of a plant manager or foreman.

1992 was the crew from Plant 874 using Plant 873 equipment. During this same period, the crew from Plant 865 used 874's equipment while 865's equipment was idle. The plaintiff does not provide any reason for rejecting or discounting Gahan's explanation of his report. According to the report, the defendant has not permanently assigned a crew to Plant 873 since the closure in late Spring or early Summer of 1991. This fact is uncontroverted.

**4.** As the plaintiff notes in his own statement of facts, Gahan testified that the primary crusher assigned to Plant 873 was used at Plant 874 in August of 1991. Gahan clarified in his testimony that there is no crew assigned to Plant 873. (Gahan Dep. 161–62). At the time of Gahan's deposition in November of 1993, Plant 873's equipment was sitting idle in Topeka, Little River, and maybe other locations. (Gahan Dep. 162–63).

**5.** The plaintiff admits writing the letter but under the mistaken impression that physical labor was required of a plant manager. The plaintiff blames his mistaken impression on what he had been asked to do and what work he had done as plant manager.

**6.** Through a considerable leap of logic, the plaintiff considers this statement of fact controverted. In August of 1991, the salaried supervisor at Plant 871 was Keith Anderson, the plant foreman. In October of 1992, the defendant promoted Anderson to plant manager III, which is the same level of management that the plaintiff had reached before he was permanently laid off. In short, the plaintiff speculates that Anderson was promoted into an available position that should have been offered to Malek. The plaintiff's speculation is not supported, but contradicted, by the evidence of record. Gahan testified that portable plants, like Plant 871, generally were supervised by only one salaried individual. From August of 1991 until October of 1992, Plant 871 was supervised by Anderson as a salaried foreman. After October of 1992, it was supervised by Anderson as a salaried plant manager III. In other words, Plant 871 needed only one salaried supervisor, and Anderson performed the same duties whether he was foreman or plant manager III. There is nothing in the record to suggest that Anderson was promoted into an existing employment opening or that he assumed additional duties that he had not been performing at Plant 871 before the promotion.

464

21. Based upon the lifting restrictions, Malek believes he is precluded from performing much of the heavy labor involved in the mining and construction industry. Malek now believes he can do the work required of a foreman or plant manager III.

22. The defendant gave the plaintiff the opportunity to interview for five salaried positions. Gahan advised Malek by letter dated April 27, 1993, of three positions: plant manager at Peculiar, Missouri; environmental engineer at Des Moines, Iowa; and safety engineer at Des Moines, Iowa. The plaintiff interviewed for these positions but was not hired. The plaintiff concedes outright the defendant's hiring decisions on the safety engineer and environmental engineer positions. As for the plant manager position at Peculiar, Missouri, the plaintiff offers no evidence to dispute Gahan's testimony that the best qualified person was selected for the position. Gahan testified that Wilmer Sudman was selected because of his "more intimate knowledge of explosive technology" and "more straight forward" way of handling employees. (Gahan Dep. 213).

23. Malek did not interview for two of the five salaried positions: plant foreman at Weeping Water and plant manager at Moline. Malek refused to interview claiming the prior interviews had been shams. Malek was not considered for these two positions because of his refusal to express any interest in interviewing for the openings.[7]

24. Of the forty reported accidents from 1988 through 1993, thirty-six employees were involved. Twenty-five of them are still employed by the defendant. Five were laid off during a reduction in force.[8] Other than the plaintiff's allegations regarding himself, the defendant's records do not show that any of the five employees after his injury or accident was assigned to a different plant and then laid off because of that plant's closing. One of the thirty-six employees retired and another died. Two left the defendant for other jobs. Two, Neil Brown and Glen Eickelberry, were terminated. Malek supervised both Brown and Eickelberry, and he told the district safety engineer after their injuries that he did not believe the injuries were legitimately work-related. Brown returned to work for one day but was told not to return again until he received a doctor's release that allowed him to perform the work of a truck driver. Eickelberry was assigned to Plant 871 at the time of his injury, and his physical restrictions prevented him from returning to work. None of the fourteen employees who were involved in lost-time accidents were ever assigned to plant 873.[9]

25. The plaintiff maintains that the only accommodation needed for his return to work as plant manager is for the defendant to require management to comply with the written job description of the plant manager position and not insist on the plant manager's participation in manual labor.

The plaintiff's claims are: (1) that he was wrongfully discharged in retaliation for pursuing workers' compensation benefits; and

7. There is no foundation for the plaintiff's belief that there was no requirement in the defendant's policy that he be interviewed for these positions.

8. In his statement of facts, the plaintiff offers that six employees: Neil Brown, Charles Nehrbass, Randy Nickelson, Glen Eickelberry, Bob Potocnik, and himself, made workers' compensation claims, were off work for a considerable length of time, and were transferred to plants that were being closed. The plaintiff's citation to the record does not substantiate this statement. Moreover, the court cannot find evidence in the record that any of these employees, with the arguable exception of Malek, was transferred to a different plant around the time of his injury. The evidence of record also does not support that they were terminated because they had filed workers' compensation claims.

9. The plaintiff, in his own statement of facts, offered his opinion that "there had been times, whenever anyone filed a work comp claim and they were off of work, it just seemed like they disappeared and they were no longer heard from." (Malek Dep. 204–05). In his deposition, he said this had been his observation. The plaintiff cited to his summary affidavit for support of this same statement. This testimony and affidavit is nothing more than an opinion or speculation lacking a foundation necessary for its admissibility. An employee's vague observation about general coincidences hardly establishes a discriminatory practice or policy by the employer. The plaintiff does not show that he has any knowledge of the reasons behind the employees' "disappearing." Nor does he set forth specific instances on which his opinion is based. The court rejects this testimony as inadmissible.

(2) that he was terminated and not recalled to work after July 26, 1992, due to his physical disabilities, in violation of the Kansas Act Against Discrimination ("KAAD"), K.S.A. 44–1001, *et seq.*, and the Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* The defendant seeks summary judgment on both claims.

## RETALIATORY DISCHARGE

■ The court reviews the evidence at summary judgment under the substantive law and evidentiary burden applicable to each claim. *Roskob v. IBP, Inc.*, 810 F.Supp. 1229, 1230 (D.Kan.1993), *aff'd,* 21 F.3d 1121 (10th Cir.1994) (Table); *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. Under Kansas law, an employee may not be discharged in retaliation for filing a workers' compensation claim, *Murphy v. City of Topeka*, 6 Kan. App.2d 488, 493, 630 P.2d 186 (1981), or "for being absent or failing to call in an anticipated absence as the result of a work-related injury," *Coleman v. Safeway Stores, Inc.*, 242 Kan. 804, 816, 752 P.2d 645 (1988). The Kansas Supreme Court has extended *Murphy* to reach claims where the employer knows of the employee's intent to file a workers' compensation claim for an injury and retaliates against the employee. *Chrisman v. Philips Industries, Inc.*, 242 Kan. 772, 775, 751 P.2d 140 (1988). In opposing summary judgment on his retaliation claim, the plaintiff has the burden of producing evidence from which a reasonable jury could find, by clear and convincing evidence, that the plaintiff was discharged in retaliation for pursuing workers' compensation benefits.[10] *Roskob,* 810 F.Supp. at 1231; *see Byle v. Anacomp, Inc.*, 854 F.Supp. 738, 742–43 (D.Kan.1994); *Palmer v. Brown,* 242 Kan. 893, 900, 752 P.2d 685 (1988).

■ The court agrees with the defendant that the plaintiff has failed to come forward with the necessary evidence. It stands uncontroverted that Plant 873, to which the plaintiff was assigned when he was released for work, was closed for economic reasons unrelated to the plaintiff's injury or his workers' compensation claim. Consequently, the plaintiff's position as plant manager at Plant 873 was eliminated while he was on medical leave. Around the same time, Gahan took other actions that reduced the number of operating plants and reduced the work force in the Central Kansas or Marion area. When the plaintiff was transferred to Plant 873, it was forecasted that Plant 873 had a better chance of surviving the reduction than Plant 871. Economic conditions changed while the plaintiff was on medical leave, and this resulted in the closing of Plant 873.

By misreading and misconstruing the evidence of record, the plaintiff makes the argument that Plant 873 was never closed but continued to produce. The plaintiff misreads the production figures in Gahan's report attributed to Plant 873 for the years of 1992 and 1993. The plaintiff ignores Gahan's reasonable explanation of those figures and offers the court no basis for rejecting the explanation. The plaintiff also misconstrues Gahan's testimony concerning Plant 873's operations. Gahan testified that the equipment assigned to Plant 873 was occasionally used at other sites after Plant 873's closing. The plaintiff interprets this testimony as evidence that his job at Plant 873 still exists. It is uncontroverted, however, that after Plant 873's closing there was no crew permanently assigned to it.

The plaintiff argues the defendant's assertion of economic reasons for Plant 873's clos-

---

**10.** "Clear and convincing" refers to the quality, and not the quantum, of proof. *Newell v. Krause,* 239 Kan. 550, 557, 722 P.2d 530 (1986). The plaintiff must prove his claim "by a preponderance of the evidence, but the evidence must be clear and convincing in nature." *Id.* For the evidence to be clear and convincing,

the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony

must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.

*Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 78, 596 P.2d 816 (1979) (citations omitted). Stated another way, "[c]lear and convincing evidence is evidence that is certain, unambiguous, and plain to the understanding and so reasonable and persuasive as to cause the trier of fact to believe it." *Chandler v. Central Oil Corp.*, 253 Kan. 50, Syl. ¶ 5, 853 P.2d 649 (1993).

ing is pretextual. He points to the fact that Gahan, in his 1982 deposition, testified in response to a question by the plaintiff's counsel:

Q. And the reason you closed the plant [873] is lack of work or lack of profitability?

A. Lack of work.

The plaintiff attaches undue significance to this isolated and ambiguous testimony. Neither the plaintiff's counsel nor Gahan explained his understanding of either reason or the differences between them. Lack of work is as much an economic reason as lack of profitability. The court does not see any substantive conflict between Gahan's testimony in 1992 and in 1993 regarding the closing of Plant 873. Gahan simply added the profitability of Plant 871 to his reasons. The plaintiff's counsel's question did not allow for Gahan to identify and explain all of his reasons. The court rejects this pretext argument and his others [11] as speculative and implausible.

The defendant had no positions as plant manager or foreman available for the plaintiff when he was released for work in August of 1991. The plaintiff fails to controvert this fact and relies, instead, on unfounded contentions. Malek first denies that he was ever transferred to Plant 873. It is uncontroverted that Gahan as the area manager had the authority to transfer plant managers.[12] Malek concedes his personnel records show this transfer. The court sets forth the documents and evidence in footnote two above that establishes the fact of the plaintiff's transfer to Plant 873. The court finds no genuine issue

of material fact regarding the plaintiff's transfer.

Another of the plaintiff's unfounded contentions is that a plant manager position was available at Plant 871 in August of 1991 and remained open until October of 1992. The plaintiff rests his contention on Anderson's promotion to manager of Plant 871 in October of 1992. Anderson's promotion, however, demonstrates only that Anderson received a salary increase and a new title for doing the same job. The promotion does not evidence that a plant manager position was open before the promotion or that Plant 871 needed another salaried supervisor besides Anderson. The plaintiff offers no evidence that the defendant hired a plant foreman for Plant 871 after Anderson's promotion to plant manager. Nor does the plaintiff present other evidence that Plant 871 needed two salaried supervisors in 1991 or that in the past the defendant typically assigned two salaried supervisors to Plant 871.

There is insufficient evidence from which a reasonable jury could find that Gahan retaliated against Malek by transferring him to Plant 873. The plaintiff offers no evidence that Gahan knew or could have known in February of 1991 that the economic conditions would change in the next months causing Plant 871 to become more profitable and Plant 873 to become less viable. The plaintiff points to no circumstances in Plant 873's operation during January and February of 1991 that indicated it was short-lived. The plaintiff does not cite any evidence that the defendant had any motives, other than economic, for laying off the hourly employees who were assigned or transferred to Plant 873 in 1991. The empirical evidence does not

---

11. For example, the plaintiff wildly hypothesizes that the defendant had a business strategy to undercut the competitors in 1990 and then force the competition to follow the higher prices that the defendant would set later. In effect, the plaintiff wants the court to make the untenable leap that Gahan was behind this price-fixing scheme, that Gahan knew this scheme would mean higher prices in 1991 only at the Woodbine quarry where Plant 871 was located, and that Gahan documented Malek's transfer in February of 1991 knowing that the scheme would soon come to fruition and result in the closing of Plant 873 at the Little River quarry. The plaintiff's allegations of price fixing are groundless. The record is devoid of any evidence to suggest that

Gahan in early February of 1991 knew or could have anticipated that Woodbine quarry would become the more profitable quarry and that Plant 873 would be closed at Little River.

12. The plaintiff cites to his summary affidavit for support of his statement that "[a] transfer cannot take place unless agreed to by the manager that is being transferred." The record offers no basis for the plaintiff having personal knowledge of the defendant's policy regarding an area manager's authority to transfer plant managers. This is an example of the deficiencies with the plaintiff's affidavit that causes this court to disregard it.

sustain an inference that the defendant retaliated against employees who sought workers' compensation benefits. The causal gap between Plant 873's closing and the plaintiff's pursuit of workers' compensation benefits is bridged only by the plaintiff's bald allegation of the defendant's retaliatory motive. This is insufficient to avoid summary judgment under the substantive law and evidentiary burdens governing a retaliatory discharge claim. *See Madrigal v. IBP, Inc.*, 811 F.Supp. 612, 615 (D.Kan.1993), *aff'd*, 21 F.3d 1121 (10th Cir.1994) (Table); *Stuart v. Beech Aircraft Corp.*, 753 F.Supp. 317, 325 (D.Kan.1990), *aff'd*, 936 F.2d 584 (10th Cir.1991) (Table).

## DISCRIMINATION ON THE BASIS OF PHYSICAL DISABILITY

 In the pretrial order, the plaintiff claims that "his employment was terminated and that the defendant failed to recall him to work after July 26, 1992, due to his physical disabilities" in violation of K.S.A. 44–1001, *et seq.* and 42 U.S.C. § 12101 *et seq.* The plaintiff's claims under this legal theory are noticeably vague, and his opposition to summary judgment on these claims does little to explain his claims. On the discharge claim, the court grants summary judgment for the reasons stated above. In particular, the plaintiff fails to come forth with evidence on which a reasonable jury could find that the plaintiff was laid off for a discriminatory reason and not because his position was eliminated with Plant 873's closing.

Reading the pretrial order and the plaintiff's memorandum in opposition (Dk. 121) together, the court concludes that the plaintiff's failure to recall claim is based exclusively on the defendant's failure to rehire him for the plant manager position given to Anderson in October of 1992.[13] The defendant is entitled to summary judgment on this claim for the reasons stated above. Specifi-

cally, the Anderson promotion does not evidence an available plant manager position for which the plaintiff could have been recalled. In short, the plaintiff cannot prove an element of his prima facie case, that is, he suffered an adverse employment decision. The defendant is entitled to summary judgment on this claim.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk. 110) is granted.

---

13. Neither in the pretrial order nor in his memorandum in opposition does the plaintiff allege, identify, or present facts to support another claim for failure to recall because of physical disability. Once the defendant carried its burden of showing entitlement to summary judgment on the failure to recall claim, the plaintiff was required to come forth with specific facts showing genuine issues of material fact exist for trial on the failure to recall claim. The plaintiff simply has not met his burden. Even assuming the plaintiff had pleaded and opposed the defendant's motion as to possible claims based on the failure to recall him for the positions identified in paragraphs twenty-two and twenty-three of the court's statement of uncontroverted facts, the court would grant summary judgment for the defendant because of the plaintiff's failure to present evidence to prove directly that the defendant acted with a discriminatory motive or indirectly that the defendant's reasons for not rehiring the plaintiff were pretextual.