Larry Dean ROWLAND, Jr. Plaintiff,

v.

**FRANKLIN CAREER SERVICES, LLC and Mid–America Training Center, LLC, Defendants.**

No. CIV.A. 02–2324KHV.

United States District Court, D. Kansas.

July 17, 2003.

**1192**

Michele Henry, C. Laurence Woods, III, Frost, Brown, Todd, LLC, Louisville, KY, Timothy F. Marks, Mary Jo Shaney, White, Goss, Bowers, March, Schulte & Weisenfels, Kansas City, MO, for defendant.

Charlotte Renee Parsons, William S. Robbins, Jr., Shughart Thomson & Kilroy, PC, Kansas City, MO, for plaintiff.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Larry Dean Rowland, Jr. brings suit against Franklin Career Services, LLC ("Franklin") and Mid–America Training Center, LLC ("Mid–America") for retaliation and discrimination on account of race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2(a)(1) and 2000e–3(a), 42 U.S.C. § 1981, and Kansas whistleblowing law. The matter is before the Court on *Defendant Franklin Career Services, LLC Mo-* *tion For Summary Judgment* (Doc. # 43) and *Defendants' Franklin Career Services, LLC And Mid America Training Center, LLC Motion For Summary Judgment* (Doc. # 53), both filed April 11, 2003. For reasons stated below, the Court overrules the motion by Franklin and sustains in part the motion by Franklin and Mid–America.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okla.,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The non-moving party may not rest on the pleadings but must

set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing summary judgment. *See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

### *Factual Background*

The following facts are either undisputed or, where disputed, construed in the light most favorable to plaintiff.

### I. Franklin Career Services, LLC

Franklin Career Services, LLC ("Franklin") is a limited liability corporation organized under the laws of Kentucky, with several subsidiaries which operate truck driving schools located throughout the country. In Kansas, Franklin registered as a foreign limited liability company for the purpose of operating a truck driving school. Gerald Woodcox is the sole member of Franklin. The Kentucky Secretary of State lists Gerald Woodcox and his son, Jeffrey Woodcox, as managers of Franklin who are vested with management of Franklin's truck driving school operations in Kansas. On March 28, 2002, Steven Diamond became president/chief executive officer and Mark Vogt became vice-president of Franklin.

### A. Mid–America

Until May 31, 2002, Mid–America Training Center, LLC ("Mid–America"), a subsidiary of Franklin, operated a truck driving school in Elwood, Kansas. It was a limited liability corporation organized under the laws of Kansas. Gerald Woodcox, the sole member of Franklin, was also the sole member of Mid–America. Gerald Woodcox and his son Jeffrey Woodcox were the only members of the board of directors for Mid–America.

### B. Relationship Between Franklin And Mid–America

Franklin provided centralized labor relations management for its subsidiaries. It provided centralized training and orientation to new school directors and, on a quarterly basis, centralized training to current school directors. It published expense guidelines which applied to all of its truck driving schools. David Paine, Franklin's chief operating officer, or his predecessor Mark Creel, generally approved pay increases, payroll advances, changes from hourly to salaried status and promotions requested by Mid–America and other subsidiary schools.

In late 2001 and early 2002, Franklin and Mid–America did not have in-house human resources departments.[1] Instead,

---

1. Some time in early 2002, Franklin created an in-house human resources department. On April 29, 2002, it hired Michael Wade to manage its human resources department. As manager of human resources Wade reported to Michael Tenney, the vice president of human resources. In the fall of 2002 Wade became the director of human resources and began reporting to Stephen Diamond, the president and chief operating officer at Franklin. As director of human resources for Franklin, Wade administered benefits, work-

Franklin contracted with HR Affiliates, which handled all of the human resource needs of Franklin and its subsidiaries. HR Affiliates assigned Michael Wade as lead consultant for its Franklin account. Wade handled employment issues for Franklin and its subsidiaries and one other client. Wade maintained an office at Franklin's corporate headquarters and at the location of the other client.

HR Affiliates maintained a variety of records for Franklin and its subsidiaries, including Mid–America. For example, Mid–America was required to send disciplinary action notices, payroll information and fringe benefit enrollment forms to HR Affiliates and it maintained backup personnel files for all Mid–America employees. HR Affiliates maintained separate databases for Franklin and its subsidiary schools, but every paycheck, W–2 form and COBRA election form for a Mid–America employee identified "Franklin Career Services, LLC" as the employer. Franklin also maintained group health and life insurance policies which covered Mid–America employees, and each school had the same fringe benefit program.

HR Affiliates disseminated to school directors certain human resource management guides which contained Franklin's policies and procedures regarding disciplinary actions and terminations. The guides also provided information directories which identified individuals at HR Affiliates for directors to contact on certain topics. For example, Patti Walker was the contact person for "Policy and Procedure Questions or Interpretations" and for "Sexual Harassment, Allegation of Dis-

crimination." Exhibit H to *Plaintiff's Memorandum In Opposition To Defendant Franklin Career Services, LLC's Motion For Summary Judgment ("Plaintiff's Memorandum")* (Doc. # 59) filed May 9, 2003.

In addition to human resource management guides, Franklin maintained an employee handbook which covered Franklin and all of its affiliated companies, including Mid–America.[2] The employee handbook provided that employment was at will "unless otherwise specified in a written employment agreement signed with a duly authorized officer (Chief Executive Officer)."[3] *Employee Handbook* at 8, Exhibit G to *Plaintiff's Memorandum* (Doc. # 59). The employee handbook also stated that the company had an "open-door policy" which encouraged employees to discuss work-related problems with their supervisors, personnel representatives or higher management.

Generally, employees reported allegations of harassment to the director of the particular school, and the director referred the complaint to Wade or another consultant at HR Affiliates. Wade was responsible for investigating claims of harassment and discrimination and recommending responses to the executive staff of Franklin. The Franklin executive who was responsible for the department or operation involved in the discrimination claim, together with the director (unless that director was involved in the claim), had input into the action to be taken in response to the discrimination claim.

---

er's compensation, unemployment and payroll, along with any other employment issues for Franklin and its subsidiaries throughout the country.

**2.** Every Mid–America employee was required to sign a form which acknowledged receipt of the employee handbook. Employees returned

the forms to their supervisors, who turned them in to HR Affiliates.

**3.** Mid–America did not employ a chief executive officer and its school director did not have authority to enter a written employment agreement with any employee.

### 1. Subsidiary Employees

Several employees who worked for subsidiary truck driving schools of Franklin transferred from one school to another. For example, while Franklin hired Tracy Dayton as director of a school in Decatur, Alabama, he later became director at Mid–America. Dayton directed Mid–America until May 31, 2002, when it closed. Franklin then transferred him to oversee the closings of other schools. Greg Blanton, who was director of training at Mid–America became director of the facility at Atchison, Kansas during its start-up phase. On July 15, 2001, Franklin transferred Pat Brushwood, an employee at Mid–America, to the phone room at Franklin corporate headquarters in Louisville, Kentucky. Two weeks later, on July 30, 2001 it transferred him to a school in Dothan, Georgia, where he worked as sales manager. On October 8, 2001, Franklin transferred Brushwood back to Mid–America, where he was a recruiter. Employees who transferred maintained their original hire dates for purposes of benefit eligibility.

### 2. Mid–America Financial Records

As of March 28, 2002, Franklin maintained the financial records for Mid–America.[4] Mid–America's balance sheet for the year ending in 2002 indicates that Franklin owes Mid–America $1,076,177.10. This account receivable is more than 99 per cent of Mid–America's assets. As of December 31, 2002, Mid–America's only fixed asset was $255.49, representing accumulated depreciation on unlisted automobiles.

### 3. Information Requests

Employees and members of the community believed that employees of Mid–America actually worked for Franklin. On May 20, 2002, the Missouri Division of Social Services sought information about Terry Wright, who was a Mid–America director, and addressed an employer information request to Franklin. The State of Kansas Child Support Enforcement Office addressed a request for information to Franklin regarding Thomas Shaw, who was a Mid–America instructor.[5] HR Affiliates provided the requested information to both agencies. On at least three occasions, HR Affiliates received prior employment inquiries. The forms, which HR Affiliates signed on behalf of Franklin, indicated that Franklin had employed the specified employees.[6]

## II. Mid–America Operations

The Mid–America truck driving school in Elwood, Kansas provided training for students to obtain a Class A commercial drivers license ("CDL"). A CDL is necessary for employment as an over-the-road driver of a semi tractor-trailer. Mid–America's two-week training program included classroom instruction, skills training in a restricted lot, shifting training and road training. Instructors were responsible for skills, shifting and road training. Lead instructors and training directors conducted classroom training.

### A. Director Of Training

In early October of 2001, Greg Blanton was director of training at Mid–America. On October 28, 2001, Kenneth Martinez

---

4. The record does not indicate whether Franklin maintained Mid–America financial records before March 28, 2002.

5. Plaintiff's fact is uncontroverted, but the record does not reveal the date of this information request.

6. The employees, Dayton, Norman Williams and Jeremy Larabee, worked at Mid–America and had been laid off because of a reduction in force ("RIF").

replaced Blanton as director of training. The director of training supervised instructors and was responsible for hiring instructors, assigning their duties and scheduling their hours. The director of training also had authority to fire instructors. While each acted as director of training, Blanton and Martinez reported to Terry Wright, the school director.

No one trained Martinez for his position as director of training. He did not know that Mid–America used HR Affiliates as its human resource firm or that HR Affiliates was under Franklin's control, and he was not trained to handle complaints of discrimination or harassment. Martinez believed that Mid–America's complaint procedure consisted of employees reporting harassment to him. In fact, he instructed employees to see him or the school director if they had a problem. Martinez was not aware of a written policy regarding harassment.

## B. Mid–America Instructors

Mid–America instructors taught students how to drive semi tractor-trailers and it had at least seven trucks which it used for training. Instructors were required to operate the trucks and work in the lot and on the range.[7] The training director assigned instructors to particular hours and duties, and assigned instructors either to the classroom, the lot or range, or the road. After two weeks of training, students took a driving test with a state examiner at the Class A CDL test site in Kansas City. The state examiner required students to provide a truck for the test and Mid–America allowed students to use three of its seven trucks for testing pur-

poses. A Mid–America instructor drove the student to Kansas City in the truck and, after the test, drove the student back to the Elwood campus.

In November of 2001, the training director assigned two instructors—Howard Stanton and Orville Power—to drive students to the test site.[8] Stanton resigned in November of 2001 and instructors who wanted the duty wrote their name on a board in Martinez's office. Plaintiff was the first to put his name on the board, but Darrell Shopbell received the assignment.[9] Mid–America generally paid new instructors $11.50 per hour, but plaintiff believed that the person who drove students to the testing site would get more overtime and receive $12.25 per hour. Power and Shopbell did work some overtime, but Mid–America continued to pay them $11.50 per hour. *See* Exhibit JJ to *Plaintiff's Memorandum* (Doc. # 59).

### 1. Plaintiff's Employment

Plaintiff is African American. Plaintiff had more than three years of over-the-road truck driving experience and on October 16, 2001, Blanton hired him to work as an instructor for Mid–America. Blanton initially supervised plaintiff, but when Martinez replaced Blanton as training director on October 28, 2001, Martinez became plaintiff's supervisor. Near the end of November of 2001, Martinez conducted a performance review of plaintiff and reported that he was doing an excellent job. Plaintiff did not have any performance problems during his employment at Mid–America.

7. In the lot, instructors taught students how to park a tractor and trailer, back up, pull straight and make turns. On the range, instructors taught students how to shift, turn properly, and uncouple and couple the tractor and trailer.

8. These instructors did not have different titles, Mid–America still labeled them "instructors."

9. The record does not indicate whether Martinez or Wright made the decision to give the duties to Shopbell.

In the first week of December of 2001, Martinez reduced plaintiff's schedule from 40 to 30 hours per week.[10] In the second week of December he further reduced plaintiff to 20 hours per week. In the third week of December he reduced plaintiff's hours to zero. Plaintiff did not perform any work after December 15, and Mid–America records indicate that he was laid off on December 31, 2001. Martinez did not notify plaintiff that he was laid off until January 11, 2002. That same day, plaintiff received a reduction in force ("RIF") letter. The letter, printed on Mid–America letterhead, states that as a result of a company-wide RIF, "effective ... January 11, 2002 your employment with Franklin Careers Services, LLC will be terminated." Exhibit L to *Plaintiff's Memorandum* (Doc. # 59). The letter directed plaintiff to contact Wade if he had questions concerning insurance or other aspects of the RIF. *Id.; Rowland Deposition* at 12–13, Exhibit C to *Plaintiff's Memorandum* (Doc. # 59). The letter was signed by "Franklin Career Services LLC, William M. Creel, Chief Operating Officer." Exhibit L. Dwayne Corlex, who had assumed the position of school director, called plaintiff back to work on May 7, 2002 but permanently laid him off on May 31, 2002, when the school closed.

## 2. Instructors Hired In November Of 2001

As director of training, Martinez hired four white men (Tom Shaw, Orville Power, Darrell Shopbell and Mike Ecord) and one African–American man (Leroy Washington) in November of 2001, the month after Blanton hired plaintiff.[11] Washington resigned on November 20, 2001. Some of these instructors had less experience than plaintiff, but they continued to work at Mid–America after plaintiff was laid off. For example, Shopbell and Shaw were recent graduates of Mid–America and Shopbell had only three or four months of experience as a truck driver (none as an over-the-road truck driver) when Martinez hired them.[12] On January 21, 2002, Martinez terminated Shaw for insubordination. As part of reductions in force, Martinez terminated Ecord on March 15, 2002, Power on May 17, 2002, and Shopbell on May 31, 2002.

## C. Safety Concerns

While training students, plaintiff observed and reported a variety of safety violations to Martinez and Wright.[13] Specifically, in late November and early December of 2001, plaintiff reported inadequate seat belts, missing or inoperative lights (*i.e.* brake lights, turn signals, head

---

**10.** Martinez testified that in late November or early December of 2001, he held a meeting which all instructors except for Phelts and Keith attended. Martinez told the instructors that Mid–America had to cut its work force. *Martinez Deposition* at 135–36, Exhibit B to *Defendants' Memorandum In Reply To Plaintiff's Opposition To Defendants' Motion For Summary Judgment* (Doc. # 63) filed May 29, 2003. Martinez and the instructors discussed what could be done to shorten employee hours and Martinez asked who had another source of income. He testified that plaintiff and Smith had other jobs (plaintiff worked part-time at an Amoco and Smith was in horse trading, sales and servicing), and that they volunteered to have their hours reduced.

*Id.* at 139–40. Plaintiff denies volunteering for a reduction in hours.

**11.** Martinez hired Washington on November 6, Shaw on November 10, Power on November 14, Shopbell on November 17 and Ecord on November 20, 2001.

**12.** *Martinez Deposition* at 90–91, Exhibit B to *Plaintiff's Memorandum* (Doc. # 59). The record does not indicate the dates on which Shopbell and Shaw graduated from Mid–America.

**13.** Plaintiff also recorded the problems in a report which drivers filled out and submitted each time they drove a truck.

lights, tail lights, clearance lights and marker lights), inoperative and unsafe brakes, unsafe tires, inoperative horns and missing safety equipment. On several occasions, plaintiff also reported that some students were taking pills to dilute their urine to pass drug tests [14] and inquired about allowing students who did not pass drug tests to operate the trucks.

Plaintiff initially reported safety problems to Martinez, who was responsible for truck maintenance. In late November of 2001, when plaintiff reported brake problems to him, Martinez laughed. At times Martinez responded to plaintiff's reports by telling him that his "job was to train the students, not to worry about the trucks." *Plaintiff's Memorandum In Opposition To Defendants Franklin Career Services LLC And Mid–America Training Center LLC's Motion For Summary Judgment* ("*Plaintiff's Opposition*") (Doc. # 60) filed May 9, 2003. Plaintiff only reported a violation to Wright on one occasion because Wright was sometimes out of his office and unavailable.[15] Plaintiff believed that Mid–America never made the repairs which he reported.

On March 16, 2001, Mid–America hired Tom Smith as an instructor.[16] Smith also observed and reported safety violations to Martinez and Wright. For example, he reported inadequate seat belts (students sat in a truck sleeper unrestrained by safety belts), unsafe tires and brakes, inoperative lights and general repairs. Smith knew that Mid–America policy prohibited students who failed drug tests from being in the trucks and driving them on the road. He reported to Martinez and Wright that some students who had failed their drug tests were still operating the trucks. Smith also reported an incident in which he suspected that two students had operated trucks under the influence of drugs. Martinez nonetheless allowed the two students to test for their Class A CDL licenses the next day. In December of 2001, after Smith reported these incidents, Martinez transferred Smith to the lot and refused to let him train students on the road.

While he worked in the lot, Smith filled out reports which specified needed equipment repairs. Some repairs were not made. *Smith Affidavit* at 4, Exhibit 2 to *Plaintiff's Opposition* (Doc. # 60). In December of 2001, Mid–America asked Smith to use some of his accrued vacation time over the Christmas holiday.[17] Smith agreed and took 10 days of vacation. *Id.* When he returned to work in January of 2002, Martinez told Smith that he was laid off. Two weeks later Martinez called Smith back to work. Although Smith previously had worked four 10–hour days (Monday through Thursday), Martinez scheduled him to work two 10–hour days (Saturday and Sunday) when he returned. Smith asked Martinez and Wright to explain the reduction in hours, and he resigned when they did not provide one.

### D. Racial Epithets And Jokes

In late November or early December of 2001, plaintiff told Martinez that he had heard Shopbell and Shaw say that "niggers didn't have no place in a truck." When plaintiff described the conversation, Martinez laughed out loud, then returned to his office. In December of 2001, four

---

**14.** Plaintiff believed that Martinez distributed the pills to students.

**15.** Plaintiff did not have much interaction with Wright because plaintiff worked in the lot and Wright's office was in the building. Plaintiff only returned to the building at noon and at the end of the day. Wright usually was not available at noon and he was gone by the time plaintiff returned at the end of the day.

**16.** The record does not indicate who hired Smith.

**17.** The record does not specify who asked Smith to use his accrued vacation time.

days before plaintiff's last reported day of work, plaintiff heard Martinez tell Shopbell and Shaw that niggers do not have any business in trucks. Plaintiff walked into the room after hearing this comment and asked Martinez why he did not fire plaintiff when he took over the director's position. Two days later, plaintiff heard Martinez tell Shaw jokes about black people having big lips and likening African Americans to monkeys. Within days after plaintiff reported discrimination to Martinez, Martinez wrote plaintiff off the work schedule. At that time, plaintiff was the only African–American instructor at Mid–America.

## E. Reduction In Force And Lay Offs

Mid–America records indicate that in September of 2001 it enrolled 73 students, of whom 62 graduated; in October of 2001 it had 118 students, of whom 89 graduated; in November of 2001 it enrolled 82 students, of whom 55 graduated; in December of 2001 it enrolled 75 students, of whom 42 graduated; in January of 2002 it enrolled 111 students, of whom 82 graduated; in February of 2002 it enrolled 80 students, of whom 54 graduated; and in March of 2002 it enrolled 28 students, of whom 15 graduated.[18]

On October 23, 2001, Gerald Woodcox called a special meeting which Franklin executives and Wade attended. At the meeting, the executives discussed the fact that operating costs had gotten out of hand and proposed a 10 per cent across-the-board RIF at all schools connected to Franklin. *Wade Deposition* at 120–22, Exhibit A to *Plaintiff's Memorandum* (Doc. # 59). Regarding Mid–America, the proposed RIF notification listed four part-time Mid–America employees (Bill Parker, Rick Phelts, Dennis Firth and Robert Keith) who would potentially be subjected to a RIF. The list did not include plaintiff. Mid–America did not lay off anyone until December 31, 2001, when it laid off plaintiff and the four part-time employees who were on the list dated October 23, 2001.

HR Affiliates made recommendations to terminate or suspend various Mid–America employees and specified criteria to use when selecting individuals for lay-off status. In December of 2001, Wright contacted Wade at HR Affiliates to ask how to determine who to lay off. Wade told Wright to base his decision on employee qualifications—job knowledge, skills, experience, training, ability and fitness. Wade advised Wright to use an employee's time with the company as the tie breaker.

On January 16, 2002, five days after Martinez informed plaintiff that he was laid off, Martinez hired Ray Shifflett, a white male, as an instructor. Martinez also recalled three of the part time employees who had been laid off on December 31.[19] Martinez unsuccessfully tried to reach plaintiff at least twice to offer him work. In May of 2002, Dwayne Corlex, who had assumed the position of school director, called plaintiff back to work.

Plaintiff filed suit on July 10, 2002, alleging that Franklin and Mid–America are a single employer and that they discriminated and retaliated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 in (1) promoting a white instructor over him, (2) reducing his work hours and (3) laying him off in December of 2001. Plaintiff also alleges that Franklin and Mid–America retaliated against him for whistleblowing, *i.e.* because he complained about safety issues. *Pretrial Order* (Doc. # 41) filed April 4, 2003 at 4.

---

**18.** Those who did not graduate dropped out or were disqualified.

**19.** Martinez recalled Parker on January 16, Smith on January 21 and Phelts on January 23, 2002.

Franklin and Mid–America deny plaintiff's claims and argue that they are entitled summary judgment on all claims. Franklin argues that although it is the parent corporation of Mid–America, Mid–America is an independently organized limited liability company and Franklin is not liable for the actions of Mid–America. With regard to plaintiff's claim of discriminatory failure to promote, defendants argue that Mid–America did not deny plaintiff a promotion, since the additional duty which he sought—driving students to the testing site in Kansas City—did not involve more pay or even a different title. Defendants also argue that in reducing plaintiff's hours and laying him off, Mid–America did not treat him different than similarly situated non-minority employees. Defendants also argue that even if plaintiff can establish a prima facie case on these points, Mid–America reduced his hours and laid him off for a legitimate, nondiscriminatory reason—school operating costs were excessive and had to be reduced.

Franklin and Mid–America also argue that they are entitled to summary judgment on plaintiff's retaliation claim because (1) plaintiff did not engage in a protected activity, (2) Mid–America has articulated a legitimate nondiscriminatory reason for reducing plaintiff's hours and laying him off and (3) plaintiff cannot establish pretext.

Finally, defendants seek summary judgment on plaintiff's whistleblowing claim because he did not report allegedly illegal activity to higher management or law enforcement and, even if he did so, plaintiff

has insufficient evidence that Mid–America did not adequately maintain its trucks.

### *Analysis*

## I. Single Employer

To establish a prima facie case under Title VII, plaintiff must prove that Franklin and Mid–America were his employers. *See* 42 U.S.C. § 2000e–2; *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1361 (10th Cir. 1993). Franklin seeks summary judgment, arguing that it was not plaintiff's "employer." Plaintiff argues that Franklin, as parent of Mid–America, is part of an integrated enterprise with Mid–America, and is therefore liable for his claims.

The law allows businesses to incorporate to limit liability and isolate liabilities among separate entities. *See Cascade Energy & Metals Corp. v. Banks,* 896 F.2d 1557, 1576 (10th Cir.1990), *cert. denied,* 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990). The doctrine of limited liability creates a strong presumption that a parent company is not the employer of its subsidiary's employees, and courts have found otherwise only in extraordinary circumstances. *Johnson v. Flowers Indus., Inc.,* 814 F.2d 978, 980–81 (4th Cir.1987). Federal courts have employed several tests to determine whether Title VII liability can be imposed on a parent corporation for the actions of its subsidiaries. *See Frank,* 3 F.3d at 1362. These tests include: (1) whether the two companies are integrated, (2) whether the parent exercises a significant degree of control over the subsidiary's decisions,[20] (3) whether the parent is the alter ego of the subsidiary,[21] and (4)

---

**20.** This test is known as the agency test. *See Nation v. Winn–Dixie Stores, Inc.,* 567 F.Supp. 997, 1010 (N.D.Ga.1983).

**21.** Under the alter ego test, plaintiff must establish that the parent is the alter ego of the subsidiary. Courts may pierce the corporate veil to "prevent fraud, illegality or injustice,

or when recognition of the corporate entity would defeat public policy or shield someone from liability from a crime." *Zubik v. Zubik* 384 F.2d 267, 272 (3d Cir.1967), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968).

whether the parent exercises extensive control over the acts of the subsidiary with respect to the particular claim of wrongdoing.[22] *Frank,* 3 F.3d at 1362; *Schmitt v. Beverly Health & Rehab. Servs., Inc.,* 993 F.Supp. 1354, 1358 (D.Kan.1998). Although the Tenth Circuit has declined to adopt a single test, the critical inquiry under each test is whether the parent exercised control over significant aspects of plaintiff's terms and conditions of employment or the parent dominated the subsidiary's operations to such a degree that the two companies are in reality a single entity. *See Johnson v. Flowers Indus., Inc.,* 814 F.2d 978, 980–81 (4th Cir.1987); *Magnuson v. Peak Technical Servs., Inc.,* 808 F.Supp. 500, 507–08 (E.D.Va.1992); *see also Frank,* 3 F.3d at 1363 (critical question is "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination") (quoting *Trevino v. Celanese Corp.,* 701 F.2d 397, 404 (5th Cir.1983)). The presumption of limited liability, however, remains the rule. *See Johnson,* 814 F.2d at 981. "Only evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary—domination similar to that which justifies piercing the corporate veil—is sufficient to rebut this presumption, . . . and to permit an inference that the parent corporation was a final decision-maker in its subsidiary's employment decisions." *Lusk v. Foxmeyer Health Corp.,* 129 F.3d 773, 778 (5th Cir.1997).

■ Here, Franklin and plaintiff concede that the integrated enterprise test applies. In *Frank,* the Tenth Circuit identified four factors which apply to the integrated enterprise test: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. 3 F.3d at 1362. The first three factors are weighed more heavily than the last. *Eichenwald v. Krigel's, Inc.,* 908 F.Supp. 1531, 1541 (D.Kan.1995). The most important inquiry is whether the parties have an arm's length relationship. *Knowlton v. Teltrust Phones, Inc.,* 189 F.3d 1177, 1184 (10th Cir.1999).

## A. Interrelation Of Operations

Several types of evidence show interrelated operations. For example, courts have found interrelated operations based on (1) evidence that a parent kept a subsidiary's books, issued its paychecks and paid its bills, *McKenzie v. Davenport–Harris Funeral Home,* 834 F.2d 930, 933–34 (11th Cir.1987), (2) evidence that the parent and subsidiary had common employees, the same headquarters, and common advertising and that the parent rented its properties to the subsidiary, *Perry v. Manocherian,* 675 F.Supp. 1417, 1426 (S.D.N.Y.1987), and (3) evidence that the parent and subsidiary shared services, equipment, employees and office space and the parent controlled the subsidiary's payroll and benefit program, *EEOC v. Fin. Assurance, Inc.,* 624 F.Supp. 686, 689–90 (W.D.Mo.1985).

■ Here, Franklin contracted with HR Affiliates to maintain a variety of records for Mid–America. Wade, who handled the Franklin account for HR Affiliates, maintained an office at Franklin's corporate office. HR Affiliates maintained backup personnel files for all Mid–America employees and Mid–America was required to send disciplinary action notices, payroll information and enrollment forms for employees fringe benefits to HR Affiliates.

---

**22.** This test is known as the instrumentality test. *Fanfan v. Berwind Corp.,* 362 F.Supp. 793, 795 (E.D.Pa.1973).

Although HR Affiliates maintained separate databases for Franklin and each subsidiary school, every paycheck, W–2 form and COBRA election form for every Mid–America employee identified "Franklin Career Services, LLC"—without any reference to Mid–America—as the employer. Franklin maintained group health and life insurance policies which covered Mid–America employees, and each truck driving school had the same fringe benefit program. In responding to prior employment inquiries about Mid–America employees, HR Affiliates indicated that Franklin had employed the employees, and it signed the forms on behalf of Franklin.

Franklin and its subsidiaries freely exchanged employees. For example, Franklin hired Tracy Dayton to direct the schools in Decatur, Alabama and Elwood, Kansas, then transferred him to oversee the closings of other schools. Blanton, who was director of training at Mid–America, became the director of the facility at Atchison, Kansas during its start-up phase. Franklin transferred Pat Brushwood, a Mid–America employee, to Franklin corporate headquarters, then to a truck driving school in Dothan, Georgia, then back to Mid–America. Transferred employees maintained their original hire dates for purposes of benefit eligibility.

Based on this record, the Court finds that plaintiff has created a material factual dispute with regard to the interrelation prong.

## B. Centralized Control Of Labor Relations

■ Whether the parent controls labor relations is an important factor in the integrated enterprise test. *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090 (10th Cir.1991). *Cf. Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983) (control of labor relations is most important factor). The critical question is, "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Trevino*, 701 F.2d at 404. A parent's broad general policy statements regarding employment matters are not enough to satisfy this prong. *Wood v. S. Bell Tel. & Tel. Co.*, 725 F.Supp. 1244, 1249 (N.D.Ga.1989). To satisfy this prong, Franklin must control the day-to-day employment decisions of Mid–America. *See Armbruster v. Quinn*, 711 F.2d 1332, 1338–39 (6th Cir.1983) (common officer in parent and subsidiary approved all subsidiary hiring decisions); *Baker v. Stuart Broad. Co.*, 560 F.2d 389, 392 (8th Cir.1977) (parent issued rules regarding employment practices which subsidiaries were required to follow); *Smith v. Jones Warehouse, Inc.*, 590 F.Supp. 1206, 1208 (N.D.Ill.1984) (parent issued personnel policies, paid subsidiary's non-union employees, was listed as employer on W–2 forms of subsidiary's non-union employees and terminated subsidiary employee on one occasion).

■ Franklin provided a centralized location for labor relations, training and orientation to new school directors and, on a quarterly basis, training to current school directors. Franklin published expense guidelines which applied to all of the truck driving schools and generally approved pay increases, payroll advances, changes from hourly to salaried status and promotions for Mid–America. As noted, Franklin contracted with HR Affiliates to handle all human resource needs for Franklin and its subsidiaries: HR Affiliates disseminated human resource management guides, provided contact people, and maintained an employee handbook. Mid–America did not employ a chief executive officer and its director did not have authority to enter a written employment agreement with any employee.

Regarding allegations of harassment or discrimination, the employee handbook instructed employees to report complaints to the school director, who was to refer the complaint to HR Affiliates. HR Affiliates investigated such claims and recommended responses to the executive staff of Franklin. Franklin and the relevant school director (unless that director was involved in the claim) had input into the response.

Based on this record, plaintiff has created a material factual dispute with regard to the control prong.

### C. Common Management

■ Common management examines whether the two entities have common directors and officers. *See Tatum v. Everhart*, 954 F.Supp. 225, 229 (D.Kan.1997). One common manager is insufficient to establish a disputed material fact under this prong of the integrated enterprise test. *See Frank*, 3 F.3d at 1364. Nonetheless, the existence of common officers is relevant if they were involved in management. For example, courts have found common management where a common president controlled personnel management of both companies, and the companies had other common officers, see *McKenzie*, 834 F.2d at 933–34; where parent and subsidiary had same officers, directors and president, see *Baker*, 560 F.2d at 392; where the same family consulted often on business matters and headed both parent and subsidiary, see *Fin. Assurance, Inc.*, 624 F.Supp. at 689; and where parent and subsidiary had identical list of officers and directors, see *Smith*, 590 F.Supp. at 1208.

■ Plaintiff has presented evidence of common management. Franklin and Mid-America had common officers and managers. Gerald Woodcox, the sole member of Franklin, was the sole member of Mid-America. Gerald Woodcox and Jeffrey Woodcox are Franklin managers who manage Franklin's truck driving school operations in Kansas. They are the only members of the board of directors for Mid-America. Based on this record, plaintiff has created a material factual dispute with regard to the common management prong.

### D. Common Ownership Or Financial Control

It is undisputed that Franklin is the sole shareholder of Mid-America, and that as of March 28, 2002, Franklin maintained the financial records for Mid-America. Mid-America's balance sheet for 2002 indicates that Franklin owed Mid-America $1,076,177.10 and that this account receivable is more than 99 per cent of Mid-America's listed assets. As of December 31, 2002, Mid-America's only fixed asset was $255.49, representing accumulated depreciation on unlisted automobiles. This factor, standing alone, is not enough to establish parent liability. Nonetheless, considering all four factors together, plaintiff has established a genuine issue of material fact whether Franklin was his employer. Given the entanglement of management control between Franklin and Mid-America, summary judgment is not appropriate and Franklin's motion for summary judgment is overruled.

### II. Race Discrimination Under Title VII And Section 1981

Plaintiff claims that at least partially because of his race, defendants (1) promoted a white instructor to drive students to testing sites, (2) reduced his work hours and (3) laid him off in December of 2001. *Pretrial Order* (Doc. # 41) at 7. Defendants seek summary judgment, arguing that the assignment which plaintiff sought was not a promotion, that plaintiff volunteered to have his hours reduced, that Mid-America did not treat plaintiff differently than similarly situated nonminority employees, and that in any event, Mid-

America had a legitimate nondiscriminatory reason for reducing plaintiff's hours and laying him off.

■ The Court uses the familiar *McDonnell Douglas* framework to analyze plaintiff's discrimination claims. *McDonnell Douglas* provides a three-step, burden-shifting process by which to evaluate plaintiff's claims. First, plaintiff must establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If plaintiff establishes a prima facie case, the burden shifts to defendants to articulate a facially nondiscriminatory reason for their actions. *See Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1533 (10th Cir.1995). If defendants articulate a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a reasonable jury might conclude that defendants' proffered reason is pretextual. *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir.1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995)). This analytical framework, first articulated in a Title VII case, applies as well to claims under Section 1981. *See Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir.1994) *cert. denied* 513 U.S. 819, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994).

### A. Failure To Promote

■ To establish a prima facie case of discriminatory failure to promote, plaintiff must show that (1) he was a member of a protected class; (2) he was qualified for the position; (3) he did not receive the promotion; and (4) Mid–America filled the position with a nonminority or it remained open. *Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir.2000). Defendants argue that plaintiff cannot establish a prima facie case because the task of taking students to the test site in Kansas City was not a promotion—it was merely a duty assigned to an instructor. Defendants further argue that this duty did not result in more pay, that the person with the duty was still an "instructor" and that even though the task might involve overtime, it did not require significantly more overtime than any other task. *Defendants' Franklin Career Services, LLC And Mid America Training Center, LLC Memorandum In Support Of Their Motion For Summary Judgment* (Doc. # 54) filed April 11, 2003 at 4–5.

Plaintiff does not respond to defendants' argument on this point. The Court therefore deems the claim abandoned. *See Merkel v. Leavenworth County Emergency Med. Servs.*, No. 98–2335–JWL, 2000 WL 127266, at *1 (D.Kan. Jan.4, 2000). Defendants' motion for summary judgment on plaintiff's claim of failure to promote is therefore sustained.

### B. Reduction Of Hours And Lay–Off

■ Plaintiff claims that defendants discriminated on the basis on race when they selected him rather than nonminority employees for a reduction in hours and for lay off. To establish a prima facie case of disparate treatment on the basis of race, plaintiff must show (1) that he belongs to a protected class, (2) he suffered an adverse employment action, and (3) that the adverse employment action occurred under circumstances which give rise to an inference of discrimination.[23] *See Hysten v.*

---

**23.** Both parties cite *Hysten v. Burlington N. & Santa Fe RR Co.*, 167 F.Supp.2d 1239 (D.Kan. 2001), for the proposition that to establish a prima facie case, plaintiff must show that he was treated less favorably than similarly situated nonminority employees. Proof that similarly situated nonminority employees were treated in a preferential manner is one way to meet the third element of a prima facie case but it is not necessarily the only way. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (prima facie standard is

*Burlington N. & Santa Fe R.R. Co.,* 296 F.3d 1177, 1181 (10th Cir.2002). Defendants agree that the first two elements are met, but allege that plaintiff does not meet the third element because they also reduced the hours of Smith, a similarly situated white male, and they laid off four other similarly situated nonminority employees in December of 2001. Defendants also argue that even if plaintiff can establish a prima facie case, Mid–America reduced his hours and laid him off for a legitimate nondiscriminatory reason.

▮ An employee is similarly situated to plaintiff if the employee deals with the same supervisor and is subject to the "same standards governing performance evaluation and discipline." *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1232 (10th Cir.2000) (quoting *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1404 (10th Cir. 1997)). In determining whether employees are similarly situated, a court compares relevant employment circumstances such as work history and company policies. *Id.* Although Mid–America also reduced the hours of Smith and laid off four part time white employees, the record establishes that plaintiff was a qualified instructor and that in December of 2001 defendants did not reduce hours or lay off full time white instructors who Martinez supervised and who were subject to the same standards as plaintiff. Plaintiff has therefore stated a prima facie case. The burden therefore shifts to defendants to produce evidence that their decisions were based on legitimate nondiscriminatory reasons. *See Reynolds,* 69 F.3d at 1533.

▮ Defendants have met this relatively light burden by stating that they reduced plaintiff's hours and laid him off in December of 2001 because of excessive operating costs at the school. Defendants explain that they tried to reduce personnel expenses, first by reducing the hours of two employees, plaintiff and Smith, and later by eliminating five positions. Because defendants have met their burden, the presumption of discrimination drops from the case and plaintiff must establish by a preponderance of the evidence "that the proffered reason was not the true reason for the employment decision." *Aramburu,* 112 F.3d at 1403.

Plaintiff claims that defendants' proffered reason is pretext because they did not follow their own RIF criteria and they hired and recalled white instructors after they laid off plaintiff. Defendants argue that plaintiff cannot show pretext because he volunteered for the reduced hours and defendants selected individuals for reduced hours based on which employees had other employment opportunities available. As to the lay off, defendants simply state that plaintiff has no evidence that defendants' explanation is pretextual.

▮ A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that defendants' stated reason for the adverse employment action was false; (2) with evidence that defendants acted contrary to written company policy prescribing the action to be taken by defendants under the circumstances; or (3) with evidence that defendants acted contrary to company practice when making the adverse employment decision affecting plaintiff. *Kendrick,* 220 F.3d at 1230. In the RIF context, courts typically consider three common types of evidence when determining whether the RIF is pretextual: (1) evidence that the termination of the employee is inconsistent with the employer's RIF criteria; (2) evidence that the employer's evaluation of the employee was

---

not inflexible; Supreme Court specification of prima facie proof required is not necessarily applicable in every factual situation); *Jones v.* *Denver Post Corp.,* 203 F.3d 748, 753 (10th Cir.2000).

falsified to cause termination; or (3) evidence that the RIF is more generally pretextual. *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1140 (10th Cir.2000) (citing *Beaird v. Seagate Tech., Inc.,* 145 F.3d 1159, 1168 (10th Cir.1998)). These methods of proof, however, do not foreclose the possibility of others. *Id.*

 Plaintiff argues that defendants did not follow their RIF criteria when they reduced his hours and laid him off. The record reveals that in October of 2001, Franklin proposed a ten per cent across-the-board RIF at all schools; that the proposed RIF notification for Mid–America listed four part-time employees who would potentially be subjected to a RIF; and that HR Affiliates specified the criteria to be used in selecting individuals for lay-off status. Specifically, Wade told Wright to base his decision on employee qualifications (job knowledge, skills, experience, training, ability and fitness) and to use an employee's time with the company as the tie breaker.

As noted, defendants claim that plaintiff volunteered for the reduction in hours and that they laid him off as part of a RIF. Plaintiff claims that he did not volunteer, and that even though he had more experience than other instructors and had been with the company longer, defendants reduced his hours and laid him off. Viewing the evidence in the light most favorable to plaintiff, a jury could reasonably find that defendants' decision to reduce plaintiff's hours and lay him off was at least partly motivated by race. Martinez reduced plaintiff's hours within days of his statement that blacks did not belong in trucks and telling racially derogatory jokes. After he hired plaintiff, Martinez hired several instructors who had less experience than plaintiff, but who continued to work after plaintiff was laid off. Plaintiff had no performance problems and he was doing an excellent job. In January of 2002, after it laid plaintiff off, Mid–America hired and recalled several white employees. It did not recall plaintiff until May of 2002—when Martinez was no longer director of training. On January 16, 2002, five days after Martinez informed plaintiff that he was laid off, Martinez hired Ray Shifflett, a white male, as an instructor. Between January 16 and 23, 2002, Martinez also called back three part time white employees who had been laid off on December 31, 2001.

Plaintiff has established genuine issues of material fact whether defendants' articulated reasons for reducing his hours and laying him off were a pretext for discrimination. His claim therefore survives summary judgment.

**C. Retaliation**

 Plaintiff claims that defendants reduced his hours and laid him off in retaliation for his complaints of racial discrimination, in violation of Title VII and Section 1981. The *McDonnell Douglas* framework is used to evaluate retaliation claims. To establish a prima facie case of retaliation, plaintiff must show that "(1) he engaged in protected opposition to discrimination; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1258 (10th Cir.2001). These elements are identical for Section 1981 and Title VII actions. *Roberts v. Roadway Exp., Inc.,* 149 F.3d 1098, 1103 n. 1 (10th Cir.1998). "As with claims for discriminatory discharge, if the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. If the employer satisfies this burden of production, then, in order to prevail on her retaliation claim, the plaintiff must prove

that the employer's articulated reason for the adverse action is pretextual, i.e. unworthy of belief." *Selenke v. Med. Imaging of Colo.,* 248 F.3d 1249, 1264 (10th Cir.2001) (quotation omitted). A retaliation claim does not require that the plaintiff prevail on the underlying discrimination claim. *See Robbins v. Jefferson County Sch. Dist. R–1,* 186 F.3d 1253, 1258 (10th Cir.1999) (quotation omitted).

Defendants argue that they are entitled to summary judgment on plaintiff's retaliation claim because (1) plaintiff did not engage in protected opposition and he therefore cannot establish a prima facie case; and (2) even if plaintiff establishes a prima facie case, defendants had a legitimate nondiscriminatory reason for reducing plaintiff's hours and laying him off, and plaintiff cannot establish that their reason is pretextual.

### 1. Protected Opposition

■ To establish that he engaged in protected activity under Title VII, plaintiff must show that he participated in a Title VII investigation or opposed Title VII violations. 42 U.S.C. § 2000e–3(a). Plaintiff contends that he engaged in protected opposition to race discrimination in late November or early December of 2001, when he reported an incident of race discrimination to Martinez. *Plaintiff's Opposition* (Doc. # 60) at 16. Specifically, plaintiff reported that Shopbell and Power had commented that "niggers didn't have no place in a truck." The opposition clause "prohibits retaliation against an employee or applicant for employment because [he] opposed any practice made an unlawful employment practice" by Title VII. *Brower v. Runyon,* 178 F.3d 1002, 1005 n. 3 (8th Cir.1999) (quoting 42 U.S.C. § 2000e–3(a)). Plaintiff must show that he based his actions on a "good faith belief that Title VII[had] been violated." *Love v. RE/MAX of Am., Inc.,* 738 F.2d 383, 385 (10th Cir. 1984) (citations omitted). In this regard,

the Tenth Circuit requires only a subjective belief of a Title VII rights violation.

Defendants argue that plaintiff did not engage in protected opposition because he did not report the alleged conduct to higher management or HR Affiliates, as proscribed in the employee handbook, and because when he contacted HR Affiliates in January of 2002, he only complained that Mid–America retained instructors with less seniority.

■ "Informal complaints to superiors constitute protected activity." *O'Neal,* 237 F.3d at 1255; *Pastran v. K–Mart, Corp.,* 210 F.3d 1201, 1205 (10th Cir.2000); *Robbins v. Jefferson County Sch. Dist. R–1,* 186 F.3d 1253, 1258 (10th Cir.1999); *Rollins v. State of Fla. Dep't of Law Enforcement,* 868 F.2d 397, 400 (11th Cir.1989). Furthermore, plaintiff does not have to prove the validity of the grievance he was allegedly punished for lodging; opposition activity is protected even when it is based on a mistaken good faith belief that Title VII has been violated. *Zinn v. McKune,* 143 F.3d 1353, 1362 (10th Cir.1998); *Love,* 738 F.2d at 385. Here, plaintiff complained to Martinez, who was his supervisor, that he heard Shopbell and Shaw say that "niggers didn't have no place in a truck." Several days later, when plaintiff heard Martinez say that blacks do not have any business in trucks, plaintiff confronted Martinez about the comment.

Such evidence is sufficient to defeat defendants' argument that as a matter of law, plaintiff did not engage in protected opposition. Defendants do not dispute the other two elements, and plaintiff has therefore stated a prima facie case of retaliation. The burden therefore shifts to defendants to produce evidence that their decisions were based on legitimate nondiscriminatory reasons. *See Reynolds,* 69 F.3d at 1533. As noted above, defendants have met this relatively light burden by

stating that they reduced plaintiff's hours and laid him off in December of 2001 because of excessive operating costs at the school. Defendants explain that they tried to reduce personnel expenses, first by reducing the hours of two employees, plaintiff and Smith, and later by eliminating five positions.

### 2. Pretext

Given facially legitimate reasons for the employment actions, plaintiff must show that the proffered reasons are, in fact, untrue. To establish pretext, plaintiff must show that "a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. A particular plaintiff could accomplish this by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997) (quotation and citation omitted). However, "mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988).

 As stated above, defendants claim that plaintiff volunteered for the reduction in hours and that they laid him off as part of a RIF—claims which plaintiff disputes. Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that at least in part, defendants decided to reduce plaintiff's hours and lay him off because he complained to Martinez. Martinez decided to reduce plaintiff's hours within a few days after plaintiff complained and confronted Martinez about his statement that blacks did not belong in the trucks. Plaintiff has established genuine issues of material fact whether defendants' articulated reason is a pretext for retaliation. The Court overrules defendants' motion for summary judgment as it relates to plaintiff's retaliation claim.

### III. Whistleblowing

Plaintiff asserts a common law whistleblowing claim, alleging that defendants retaliated against him by terminating his employment after he reported safety and maintenance violations to Martinez and Wright. Specifically, plaintiff reported inadequate seat belts, missing or inoperative lights (*i.e.* brake lights, turn signals, head lights, tail lights, clearance lights and marker lights), inoperative and unsafe brakes, unsafe tires, inoperative horns and missing safety equipment. On several occasions, plaintiff also reported that some students were taking pills to dilute their urine to pass drug tests and inquired about allowing students who did not pass their drug tests to operate the trucks. Defendants claim that they did not retaliate against plaintiff and argue that they are entitled to summary judgment because plaintiff cannot establish a whistleblowing violation. Specifically, defendants argue that plaintiff did not report the alleged safety infractions to higher management or law enforcement and that plaintiff cannot establish that genuine issues of material fact remain on this claim.

 At-will employment is the general rule in Kansas. *See Flenker v. Willamette Indus., Inc.,* 266 Kan. 198, 200, 967 P.2d 295 (1998). Kansas courts, however, have recognized public policy exceptions to the at-will employment doctrine. *See id.* One such exception is commonly referred to as the "whistleblower" exception. This exception, first announced in *Palmer v. Brown,* 242 Kan. 893, 752 P.2d 685 (1988), provides a cause of action for retaliatory

discharge where an employee is terminated for reporting to company management or law enforcement serious legal violations by co-workers or the employer. *Koehler v. Hunter Care Ctrs., Inc.,* 6 F.Supp.2d 1237, 1241 (D.Kan.1998) (citing *Palmer v. Brown,* 242 Kan. 893, 752 P.2d 685). To establish a prima facie whistleblower case, the plaintiff must show by clear and convincing evidence,[24] that (1) a reasonable person would have concluded that co-worker or company activities violated rules pertaining to public health, safety and general welfare; (2) defendants had knowledge of plaintiff's reporting of such a violation before terminating him; and (3) defendants terminated plaintiff for making the report. *Id.* at 900, 752 P.2d 685. Plaintiff must have made the report in good faith, rather than out of a corrupt motive, such as malice, spite, jealousy or personal gain, and the infraction must have been reported to "either company management or law enforcement officials." *Id.* If plaintiff establishes a prima facie case, the Court will apply the *McDonnel Douglas* burden-shifting process to evaluate plaintiff's claim. *Glover v. NMC Homecare, Inc.,* 106 F.Supp.2d 1151, 1169 (D.Kan.2000).

Defendants claim that plaintiff cannot meet the second element because he did not report the alleged infractions to higher management or law enforcement. Specifically, defendants argue that plaintiff only reported infractions to the alleged wrongdoer—Martinez—and not to higher management or law enforcement.[25] Defendants also argue that even if plaintiff had properly reported the infractions, his allegations are conclusory and unsupported.

## A. Reporting Requirement

A whistleblower report must be "to either company management or law enforcement officials." *Palmer,* 242 Kan. at 900, 752 P.2d 685. Defendants rely on *Fowler v. Criticare Home Health Servs., Inc.,* 27 Kan.App.2d 869, 10 P.3d 8 (2000), and *Boe v. AlliedSignal, Inc.,* 131 F.Supp.2d 1197 (D.Kan.2001), for the proposition that reporting an infraction to the wrongdoer does not constitute whistleblowing. *Defendants' Memorandum In Support* (Doc. # 54) at 12.

In *Fowler,* a supervisor instructed an employee to ship some guns; the employee told his supervisor that he thought the shipment was unlawful and he refused to make the shipment. 27 Kan.App.2d at 871, 10 P.3d at 11. The employee also threatened to report the supervisor if the supervisor made the shipment. *See id.* The supervisor made the shipment after the employee left the building. *See id.* The Kansas Court of Appeals held that the employee's disagreement with his supervisor "was just that; it did not qualify as an internal report to management of illegal coworker or company conduct," and that "[a] worker who wants to come under the protections of [*Palmer* ] *must seek out the intervention of a higher authority,* either inside or outside of the company." *Id.* at 876, 10 P.3d at 15 (emphasis added).

---

24. Under Kansas law, the term "clear and convincing evidence" refers not to a quantum of proof, but rather to the quality of the proof presented. *Stuart v. Beech Aircraft Corp.,* 753 F.Supp. 317, 324 (D.Kan.1990), *aff'd,* 936 F.2d 584, 1991 WL 104304 (10th Cir.1991) (citing *Newell v. Krause,* 239 Kan. 550, 557, 722 P.2d 530 (1986)). Evidence is clear and convincing if the witnesses to a fact are found to be credible; the facts are distinctly remembered; details are remembered exactly and in chronological order; the testimony is clear, direct and weighty; and the witness are not confused as to the facts at issue. *Id.* (citing *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.* 226 Kan. 70, 78, 596 P.2d 816 (1979)).

25. Martinez was responsible for truck maintenance and allegedly distributed the urine cleansing drugs.

In *Boe,* plaintiff refused to sign certain management representation letters because he believed some entries violated securities laws. 131 F.Supp.2d at 1200. He refused to sign the letters and notified his supervisor and the human resources vice president. *Id.* Plaintiff reported the alleged violations to the company's manager of government compliance and four other employees, and reported alleged bribes to his supervisor and the company hotline. Applying Kansas law, this Court concluded that as to plaintiff's supervisor, "[p]laintiff was merely taking a stand, as the employee in Fowler did," and his report did not constitute whistleblowing. *Id.* at 1204. Regarding plaintiff's reports to the human resources vice president, the manager of government compliance and the hotline, however, the Court concluded that plaintiff's reports were whistleblowing because they did more than merely voice his disagreement. *Id.*

 Viewing the evidence in the light most favorable to plaintiff, it appears that plaintiff initially reported safety problems to Martinez. In late November and early December of 2001, however, plaintiff also reported violations to Wright, who directed the school. Thus, plaintiff has established genuine issues of material fact whether he sufficiently reported the infractions to upper management.

### B. Sufficiency Of Evidence

Defendants argue that plaintiff's allegations of improper truck maintenance are conclusory and unsupported. Defendants claim that although plaintiff testified that Mid–America sent its trucks for repairs less than three times between October and December of 2001, its records for that time period contain five invoices from All American Truck and Trailer Repair and numerous payments to Michael Mount and Mount's Servicing and Repair.

The issue, however, is not whether Mid–America made the repairs, but whether Mid–America reduced plaintiff's hours and laid him off in retaliation for reporting the violations. As noted, *Palmer* requires plaintiff to establish that a reasonable person would have concluded that co-worker or company activities violated rules pertaining to public health, safety and general welfare and the third element requires plaintiff to establish causation. *Palmer,* 242 Kan. at 900, 752 P.2d 685. While training students, plaintiff observed a variety of safety violations. Plaintiff also knew that some students were taking pills to dilute their urine to pass drug tests and that some students who did not pass their drug tests were still operating the trucks. Viewed in the light most favorable to plaintiff, such evidence is sufficient to withstand defendants' motion for summary judgment. A jury could reasonably conclude that plaintiff reasonably believed that defendants or co-workers had violated rules, regulations or the law pertaining to public health, safety or the general welfare. *Id.* The Court therefore overrules defendants' motion for summary judgment on plaintiff's whistleblowing claim.

**IT IS THEREFORE ORDERED** that *Defendant Franklin Career Services, LLC Motion For Summary Judgment* (Doc. # 43) filed April 11, 2003, be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that *Defendants' Franklin Career Services, LLC And Mid America Training Center, LLC Motion For Summary Judgment* (Doc. # 53) filed April 11, 2003, be and hereby is **SUSTAINED in part,** as to plaintiff's claim of failure to promote. Defendants' motion is otherwise **OVERRULED.**